ABRAMSON & DENENBERG, P.C.
BY:  ALAN E. DENENBERG, ESQUIRE
IDENTIFICATION NO:  54161
1315 WALNUT STREET, SUITE 500
PHILADELPHIA, PA 19107
(215) 546-1345

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAMALA KATHLEEN DOVEL, Administrator of the Estate of PAUL WILLIAM REARDON 1540 E. SCHOOL ROAD BELVILLE, TX  77418 | : : : : | CIVIL ACTION |
| Plaintiff | : : | JURY TRIAL DEMANDED |
| v. | : : | No. |
| LANCASTER COUNTY 150 NORTH QUEEN STREET LANCASTER, PA 17602 and WARDEN PAUL SMEAL 150 NORTH QUEEN STREET LANCASTER, PA 17602 and CORRECTIONAL OFFICERS JOHN/JANE DOE #'S 1-10 150 NORTH QUEEN STREET LANCASTER, PA 17602 and PRIME CARE MEDICAL, INC. 3940 LOCUST LN. HARRISBURG, PA  17109 and DR. WILLIAM CATTELL 3940 LOCUST LN. HARRISBURG, PA  17109 and DR.'S JOHN/JANE DOE #'S 1-5 3940 LOCUST LN. HARRISBURG, PA  17109 and PRIMECARE MEDICAL PROVIDERS BRITTNEY MASTNJAK, LORI HEHNLY CRNP, | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | |

**and DANESSA NOGUERAS LPN**        :
**3940 LOCUST LN.**                 :
**HARRISBURG, PA  17109**           :
      **and**                 :
**PRIMECARE MEDICAL PROVIDERS**     :
**JOHN/JANE DOE #'S 1-10**          :
**3940 LOCUST LN.**                 :
**HARRISBURG, PA  17109**           :

**COMPLAINT**

## I.    INTRODUCTION

1.      Plaintiff, Tamala Kathleen Dovel (hereinafter "Plaintiff"), administrator of the Estate of Paul William Reardon (hereinafter "Decedent" or "Reardon") brings this action for damages pursuant to 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment of the United States Constitution as well as Pennsylvania Law as a result of Reardon's death while incarcerated as a pretrial detainee in Lancaster County Prison (hereinafter "LCP").

## II.    JURISDICTION AND VENUE

2.      The court has jurisdiction over the Federal Law Claims pursuant to 28 U.S.C. § 1331 and § 1343 and jurisdiction over the State Law Claims pursuant to 28 U.S.C. § 1367 and the principals of pendent and ancillary jurisdiction.

3.      Venue is proper under 28 U.S.C. § 1391(b) because the causes of action upon which the Complaint is based arose in Lancaster County, Pennsylvania, which is in the Eastern District of Pennsylvania.

## III.    PARTIES

4.      Plaintiff, Tamala Kathleen Dovel, is an adult citizen of the State of Texas residing as captioned and was the mother of the Decedent, Paul William Reardon.

5.      Plaintiff is the administrator and heir of the Estate of Paul William Reardon.

6.     At all times material hereto, Decedent was a pretrial detainee at LCP.

7.     Defendant, Lancaster County, is an entity organized and existing under the laws of the Commonwealth of Pennsylvania, which maintains a central office and/or principal place of business located as captioned.

8.     At all times material hereto, Defendant Lancaster County was charged with the constitutional duty of providing adequate medical care to the pretrial detainees/inmates housed at LCP, including the Decedent, and delegated that constitutional duty to Defendants Prime Care Medical, Inc. (hereinafter "PMC") and/or Warden Paul Smeal.

9.     At all times material hereto, Defendant Paul Smeal was the Warden at LCP and had final decision-making authority over all aspects of the prison, including, but not limited to, the intake policies and procedures at the Prison, the housing or placement of pretrial detainees/inmates, including suicidal inmates, and the medical care provided by PCM and in exercising that authority he was acting under the color of state law. Defendant Paul Smeal is being sued in his official capacity.

10.    Defendants Correctional Officers (hereinafter C/O") John/Jane Doe #'s 1-10 are adult citizens of the Commonwealth of Pennsylvania, who at all material times were employed by LCP, acting in the course of their employment pursuant to the customs, practices, and policies of LCP and under the color of state law. Defendants C/O's John/Jane Doe #'s 1-10 are being sued in their individual capacities.

11.    Defendant, PMC is a corporation with its principal place of business as set forth above. At all times material hereto, PMC was responsible for hiring, training and supervising medical/psychiatric personnel at the Prison, for providing constitutionally adequate medical care to all pretrial detainees/inmates housed in LCP, including the Decedent, and for establishing procedures, policies and training related to all aspects of providing medical care, including, but not

limited to, the medical/suicide intake of pretrial detainees/inmates and their placement on suicide watch.

12.     At all times material hereto, Defendant PMC and its employees/agents/servants were state actors/acting under color of state law, pursuant to contract and in joint participation with Lancaster County and were fulfilling a traditional governmental function by providing constitutionally required medical care to pretrial detainees/inmates at LCP.

13.     At all times material hereto, Defendant PMC acted or failed to act by and through its agents, servants, and/or employees, then and there acting within the course and scope of their agency or employment, and under color of state law.

14.     Defendant Dr. William Cattell and/or Dr.'s John/Jane Doe #'s 1-5 is/are adult individual(s) and licensed Doctors in the Commonwealth of Pennsylvania who was/were employed by PMC and responsible for providing medical care to the pretrial detainees/inmates at LCP, including the Decedent, and was/were responsible for overseeing the medical care provided by other PCM medical providers, including, but not limited to, Medical Care Providers Mastnjak, Hehnly, Shuler, Nogueras and/or John/Jane Does #'s 1-10.

15.     Defendants Medical Care Providers Mastnjak, Hehnly, Nogueras and/or John/Jane Does #'s 1-10 are adult citizens of the Commonwealth of Pennsylvania who at all times material hereto were employed by PMC as health care providers at LCP, acting under color of state law in the course and scope of their employment, and were directly responsible for providing adequate medical care to the Decedent. Defendants Medical Care Providers Mastnjak, Hehnly, Nogueras and/or John/Jane Does #'s 1-10 are being sued in their individual capacities.

## IV.     OPERATIVE FACTS

16.     Decedent was arrested for Robbery/Retail Theft and committed to LCP as a pretrial detainee on January 29, 2022.

17.     During the initial Intake that was conducted by the Prison, which was performed by Defendants C/O's John/Jane Doe #'s 1-10, Decedent answered "Yes" to a question regarding "Drugs/Alcohol" and it was noted that the drugs were "OPIATES/HERION".

18.     The Prison Intake further noted or provided "Yes" answers to the following questions: "Intoxicated or appears withdrawing"; "Under the influence of drugs or mind altering substance(s)", noting "HEROIN/OPIATES"; "Recent drug history in the past year **List Drugs", noting "OPIATES/HEROIN"; "Inmate has a history of drug/alcohol abuse", noting "OPIATES/HEROIN"; "Inmate appears to be under the influence of alcohol or drugs", noting "HEROIN"; and "Inmate is acting and/or talking in a strange manner (IE: cannot focus attention/is hearing or seeing things not there.)".

19.     The prison intake performed by Defendants C/O's John/Jane Doe #'s 1-10 identified the Decedent as a heroin/opiate addict who was withdrawing from drugs and who was acting/talking in a strange manner.

20.     Withdrawal from drugs constitutes a serious medical need and a particular vulnerability to suicide requiring that the pretrial detainee/inmate who is withdrawing from heroin/opiates be placed on suicide watch, and because the Decedent was withdrawing from heroin/opiates he had a particular vulnerability to suicide that required he be placed on suicide watch.

21.     The Decedent answered "Yes" to sixteen questions on the Prison Intake, giving him a point total of 16 (one point for each question on the intake) and identifying him as a person

with a particular vulnerability to suicide that required Defendants C/O's John/Jane Doe #'s 1-10 to place him on suicide watch.

22.    While the 16 points on the Prison Intake required Defendants C/O's John/Jane Doe #'s 1-10 to place the Decedent on suicide watch, contrary to the "Yes" answers regarding the Decedent, Defendants also intentionally answered the last question on the Intake, which asked "If #17 is yes, is inmate incoherent or showing signs of withdrawal or mental illness?", "No".

23.    This question is worth eight points, as opposed to the one point awarded for a "Yes" answer on the other questions on the Prison Intake, and pursuant to LCP policies, a "Yes" answer, standing alone, would have required that the Decedent be placed on suicide watch.

24.    Despite the fact that Defendants C/O's John/Jane Doe #'s 1-10 had already provided "Yes" answers to questions that asked whether the Decedent "appears to be withdrawing" and whether the Decedent was "acting and/or talking in a strange manner", contrary to these answers, the aforementioned Defendants intentionally answered "No" to the question regarding whether the Decedent was "incoherent or showing signs of withdrawal or mental illness" to avoid placing the Decedent on suicide watch, even though Defendants C/O's John/Jane Doe #'s 1-10 knew based on the answers to the other Prison Intake questions that the Decedent was an addict, who was withdrawing, and therefore had a particular vulnerability to suicide and was required, pursuant to LCP policies and procedures, to be placed on suicide watch.

25.    Suicide watch requires LCP and/or PMC to exhaust/employ more economic and human resources. Specifically, it requires housing the pretrial detainee/inmate where they can be continuously observed twenty-four hours a day, the human resources to observe them on a

continuous or twenty-four hour a day basis, and further requires LCP and/or PMC to provide the

pretrial detainee/inmate with a suicide smock, suicide blanket, and suicide mattress. In addition,

anything that could be used to commit suicide must be removed from the cell, and the pretrial

detainee/inmate is served finger food with no utensils.

26.     Pursuant to LCP's policy, practice and/or custom, correctional officers, including

Defendants C/O's John/Jane Doe #'s 1-10, are trained and/or instructed to answer "No" to the

question regarding "is [the] inmate incoherent or showing signs of withdrawal or mental

illness?" because it would automatically require that the pretrial detainee/inmate be placed on

suicide watch, and further trained/instructed not to place pretrial detainees/inmates on suicide

watch in an effort to save money and human resources.

27.     Defendant C/O's John/Jane Doe #'s 1-10 knew that Decedent had a particular

vulnerability to suicide based on the answers on the Prison Intake, which indicated that he was a

heroin/opiate addict who was withdrawing, and their failure to place him on suicide watch to

save LCP money and human resources served no legitimate penological purpose and amounted

to punishment in violation of the Due Process Clause.

28.     Even if the saving of money and human resources is a legitimate penological

purpose, not placing a pretrial detainee/inmate who has a particular vulnerability to suicide on

suicide watch thereby exposing him to a substantial risk of injury or death to save money and

human resources is not reasonably related to that purpose or constitutionally permissible.

29.     Defendant C/O's John/Jane Doe #'s 1-10 knew that Decedent had a particular

vulnerability to suicide based on the answers on the Prison Intake, which indicated that he was a

heroin/opiate addict who was withdrawing and were deliberately indifferent in ignoring a

substantial risk of harm or death to the Decedent by failing to place him on suicide watch.

30.     Defendant C/O's John/Jane Doe #'s 1-10 failure to place the Decedent on suicide watch despite their knowledge that he had a particular vulnerability to suicide was the direct and/or proximate cause of Reardon's death by suicide.

31.     The Prison intake was forwarded to the medical department and reviewed before the Medical Intake/Intake Suicide Screening was performed, and informed PMC Medical Provider Brittney Mastnjak, who performed the Decedent's Medical Intake, including his "Intake Suicide Screening", that Reardon was withdrawing from heroin and opiates and that he had been "acting and/or talking in a strange manner" during the Prison intake.

32.     At the start of the Medical Intake, Defendant Mastnjak noted the Decedents appearance was "Sweating", "Anxious" and "Disheveled", all indications/symptoms of a person withdrawing from drugs.

33.     During the Medical Intake/Intake Suicide Screening, Defendant Mastnjak noted that the Decedent was a heroin addict, who used at least a gram of heroin every day, which he injected intravenously, and that the last time he used was the day before, or January 28, 2022, which meant that he was already starting to go through withdrawals from his heroin addiction.

34.     During the Medical Intake/Intake Suicide Screening, Defendant Mastnjak further noted the Decedent was also addicted to opitates such as morphine, Percocet, Vicodin, Oxycontin etc., and that he used Tramadol, an opiate, every day.

35.     The Intake also informed Defendant Mastnjak that the Decedent suffered from depression and anxiety and took Cymbalta, a depression drug.

36.     Despite knowing that the Decedent was a heroin addict that had last used the day before, and was already exhibiting signs of withdrawal, such as "Sweating" and being

"Anxious", Defendant Mastnjak answered the last two questions on the Intake Suicide Screening "No":

| | |
|---|---|
| Patient **is** appears to be under the influence of alcohol or drugs | No |
| If YES is Patient incoherent or showing signs of withdrawal or mental illness? | No |

37.     A "Yes" answer on the last question is scored as eight points and would have automatically required that the Decedent be put on suicide watch.

38.     Specifically, the suicide watch policy at LCP provides that "Inmates that score eight or more on the Intake Suicide Screen . . . are to be placed on [Level I suicide watch]."

39.     Any pretrial detainee/inmate being committed at LCP who is addicted to heroin/opiates and going through withdrawal must be placed on Level I suicide watch.

40.     While the policy at LCP is to place any person going through heroin/opiate withdrawal on suicide watch, Defendant PMC, to save money and human resources, has a policy practice and/or custom of training/instructing the employee doing the Intake Suicide Screen, in this case PMC Medical Provider Mastnjak, to answer the questions referenced in paragraph 36 "No" to intentionally avoid placing the pretrial detainee/inmate on suicide watch.

41.     PMC's custom, practice and/or policy of answering the questions referenced in paragraph 36 "No" goes back to at least 2011, and the case of Ronald Snyder, who had as his only suicide risk the fact that he was withdrawing from opiate addiction and committed suicide by hanging himself at LCP.

42.     As in this case, Snyder's Intake Suicide Screen answered the identical questions referenced in paragraph 36 "No", even though the medical provider who performed the Intake

knew he was withdrawing from opiates, and the Mortality Review conducted after his suicide found this to be significant factor leading to his death:

> The single identified suicide risk factor was opiate withdrawal. This was not identified on suicide intake screen (#17 Detainee appears to be under the influence of alcohol or drugs, if yes is detainee incoherent or showing signs of withdrawal or mental illness). Ronald reported Percocet abuse, and had documented withdrawal symptoms two hours after his intake screening was completed. Had this been noted on the suicide screen Ronald would have been placed on suicide watch which may have prevented his suicide.

> Ronald specifically denied having suicidal thoughts nor did he have any prior reported suicide attempts. There is no documented behavior, other than opiate withdrawal, which would indicate a risk of suicide. Therefore, once the suicide screen was completed and #17 was not marked in the affirmative, no one seems to have considered Ronald's withdrawal symptoms as a risk for suicide.

43.     Again, in the case of Patrick Kanney (Dkt. No. 16-01580), the PrimeCare employee who conducted the Intake Suicide Screen answered the questions referenced in paragraph 36 "No", even though Kanney was addicted to both heroin and Xanax and it was clear he was going through withdrawals.

44.     Because the questions were answered "No", Kanney was not put on suicide watch and as a result he was able to hang himself.

45.     In the Kanney case, a PMC Medical Provider acknowledged in deposition testimony that if a pretrial detainee/inmate is withdrawing from heroin/opiates he or she should automatically be placed on suicide watch, even if there are no other factors indicating a risk of suicide.

46.     Intentionally answering the questions referenced in paragraph 36 "No" to avoid placing a pretrial detainee/inmate on suicide watch does not serve a legitimate penological purpose, and even if it did, it is not reasonably related to that purpose or constitutionally permissible and therefore constitutes punishment.

47.     Defendant PMC Medical Provider Mastnjak knew based on the answers to the Prison Intake and Medical Intake and Intake Suicide Screen that the Decedent was addicted to heroin/opiates and withdrawing from the drugs and therefore had a particular vulnerability to suicide.

48.     Defendant PMC Medical Provider Mastnjak ignored the Decedent's substantial risk of suicide by intentionally and/or with deliberate indifference answering the questions referenced in paragraph 36 "No" on the Intake Suicide Screen thereby ensuring the Decedent would not be placed on suicide watch even though she knew that he was withdrawing from heroin/opiates and had a particular vulnerability to suicide and that by not placing Reardon on suicide watch she was exposing him to a substantial risk of suicide and death.

49.     Defendant PMC Medical Provider Mastnjak's deliberate indifference to the Decedents particular vulnerability to suicide/substantial risk of suicide was the direct and/or proximate cause of Reardon's death by suicide and violated his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

50.     Defendant PMC Medical Provider Lori Hehnly, CRNP, in her role as Defendant Mastnjak's supervisor, reviewed the Decedent's Medical Intake/Intake Suicide Screen and acquiesced in and condoned Mastnjak's failure to answer the question referenced in paragraph 36 "Yes" and place Reardon on suicide watch notwithstanding the fact that both the Prison Intake and the Medical Intake/Intake Suicide Screen made clear that he was withdrawing from heroin/opiates and had a particular vulnerability to suicide and therefore as the direct and proximate cause of his death by suicide.

51.     Defendant, Dr. William Cattell and/or Dr.'s John/Jane Doe #'s 1-5, provided direct medical care to the Decedent, including prescribing drugs for his withdrawal from

heroin/opiates, and knew that Reardon was withdrawing from heroin/opiates and was required to be placed on suicide watch and further oversaw and reviewed the Medical Intake performed by Mastnjak and reviewed by Hehnly.

52.     Defendant, Dr. William Cattell and/or Dr.'s John/Jane Doe #'s 1-5, knew from the Intakes, as well as the withdrawal medications that he/they was/were prescribing for the Decedent, that Reardon had a particular vulnerability to suicide and was required to be placed on suicide watch, and further knew that even though he had a substantial risk of suicide that he was not placed on suicide watch.

53.     Despite Dr. William Cattell's and/or Dr.'s John/Jane Doe #'s 1-5's knowledge that the Decedent had a particular vulnerability to suicide, Defendant Dr. William Cattell and/or Dr.'s John/Jane Doe #'s 1-5 approved the Medical Intake/Intake Suicide Screen and acquiesced in and condoned the decision to not place Reardon on suicide watch.

54.     Defendant Dr. William Cattell and/or Dr.'s John/Jane Doe #'s 1-5 was/were deliberately indifferent to the Decedent's substantial risk of suicide by ignoring the fact that his withdrawal from heroin/opiates constituted a particular vulnerability to suicide that required that he be placed on suicide watch, and by acquiescing in and condoning the Medical Intake/Intake Suicide Screen and decision not to place the Decedent on suicide watch.

55.     Defendant's Lancaster County and/or Warden Smeal and/or PMC had an unconstitutional policy, practice and/or custom of being deliberately indifferent to pretrial detainees/inmates with a particular vulnerability to suicide by failing to place pretrial detainees/inmates who were withdrawing from heroin/opiates on suicide watch thereby exposing these persons to a substantial risk of suicide.

56.     Pursuant to Defendant's Lancaster County's and/or Warden Smeal's and/or PMC's unconstitutional policy, practice and/or custom of not placing pretrial detainees/inmates who were withdrawing from heroin/opiates on suicide watch, the aforementioned Defendant's trained/instructed the C.O.'s doing the Prison Intake and the Medical Providers doing the Medical Intake/Intake Suicide Screen to always answer certain questions on the Intake "No" to avoid placing the pretrial detainee/inmate who was withdrawing on suicide watch in an effort to save money and human resources.

57.     Defendant's Lancaster County's and/or Warden Smeal's and/or PMC's unconstitutional policy, practice and/or custom of not placing pretrial detainees/inmates who were withdrawing from heroin/opiates on suicide watch was the direct and proximate cause of the Reardon's death by suicide.

58.     Notwithstanding that the Decedent had a particular vulnerability to suicide, after the Prison and Medical Intakes/Intake Suicide Screens were performed on January 29, 2022, he was placed on Detox Watch and assigned to a cell in General Population, where he had access to numerous means to kill himself, including the bed sheet he used to hang himself, as well as the freedom to commit suicide.

59.     The Decedent's withdrawal symptoms were so severe that on January 31, 2022, he collapsed and was found lying in a supine position in his cell.

60.     The Decedent was lightheaded, dizzy, and suffering stomach pain, and it was determined that he was dehydrated from the throwing up/diarrhea associated with his withdrawal from heroin/opiates.

61.     Even though the Decedent was suffering from severe withdrawal symptoms, he was not put on suicide watch, but instead he was provided Gatorade to hydrate.

62.     Approximately twelve hours later, at 7:10 am on February 1, 2022, Defendant Medical Provider Danessa Nogueras, LPN was called to the Decedent's cell in response to a report that he was lying on the floor with his arms shaking from an apparent seizure.

63.     The Decedent complained of pain "in base of my head", and informed Defendant Nogueras that he did not remember what happened.

64.     Notwithstanding that the Decedent had suffered a seizure related to his withdrawal from heroin/opiates, and his withdrawal symptoms were clearly getting worse, Defendant Nogueras did not place the Decedent on suicide watch or contact a doctor regarding Reardon's severe symptoms or otherwise provide any medical care to the Decedent related to his seizure.

65.     Approximately two hours later, on February 1, 2022 at 8:51 am, Defendant Lori L Hehnly, NP was called to Decedent's cell, and informed by Decedent that he felt shaky and further informed that he was not only withdrawing from heroin/opiates, but also he was withdrawing from benzo's (Xanax, Valium etc. referred to generally as "benzodiazepine").

66.     Withdrawal from a benzodiazepine requires a different medical treatment from withdrawal from heroin/opiates and to prevent the development of seizures, which the Decedent was suffering, the patient has to first be stabilized with diazepam and then after being stabilized slowly weaned off the drug.

67.     After learning that the Decedent was also withdrawing from a benzodiazepine, Defendant Hehnly did not put Reardon on suicide watch, contract a doctor regarding this information, or provide any medical treatment for his seizures or benzodiazepine withdrawals.

68.     Defendants Nogueras and/or Hehnly and/or PrimeCare Medical Providers John/Jane Doe #'s 1-10 were deliberately indifferent to the Decedent's serious medical needs by

ignoring, and failing to provide any medical treatment for his withdrawal related seizures and/or his withdrawal from a benzodiazepine.

69.     Defendants PrimeCare Medical Providers Mastnjak and/or Nogueras and/or Hehnly and/or PrimeCare Medical Providers John/Jane Doe #'s 1-10 and/or Dr. William Cattell and/or Dr.'s John/Jane Doe #'s 1-5 had an ongoing duty to evaluate the Decedent's withdrawal symptoms and ensure that he be placed on suicide watch and were deliberately indifferent to Reardon's particular vulnerability to suicide when they observed his withdrawal symptoms worsening, including withdrawal related seizures, and learned that he was also withdrawing from a benzodiazepine, yet failed to place him on suicide watch.

70.     All Defendants knew based on LCP's policy requiring that persons withdrawing from heroin/opiates be placed on suicide watch, past experience/history at LCP regarding persons who were withdrawing from heroin/opiates committing suicide, and the empirical data establishing that withdrawal from heroin/opiates constitutes a particular vulnerability to/substantial risk of suicide that the Decedent had a particular vulnerability to suicide and should have been placed on suicide watch.

71.     In 2016, SAMHSA issued a report summarizing "the relationship between substance use and suicide." *See Substance Use and Suicide: A Nexus Requiring a Public Health Approach* (2016).

72.     In that report, SAMHSA concluded that:

- Individuals with substance use disorders (SUDs) are particularly susceptible to suicide and suicide attempts;

- Suicide is a leading cause of death among people who misuse alcohol and drugs;

- Substance misuse significantly increases the risk of suicide;

- Opiates (including heroin and prescription painkillers) were present in 20 percent of suicide deaths;

- Individuals who inject drugs are at about 14 times greater risk for suicide; and,

- The number of emergency department visits for drug-related suicide attempts increased 51 percent overall from 2005 to 2011.

*Id.* (citations omitted.)

73.     In particular, "[a]dults who abuse opioids weekly or more are more likely to engage in suicide planning and attempts." *See Understanding the Connection: Suicide and Opiod Misuse*.

74.     Notwithstanding that all named Defendants knew that the Decedent was a heroin/opiate addict who was withdrawing and therefore had a particular vulnerability to suicide, they ignored and were deliberately indifferent to his substantial risk of suicide by intentionally and knowingly failing to place him on suicide watch.

75.     All Defendants deliberate indifference to the Decedent's particular vulnerability to suicide was the direct and proximate cause of the Decedent hanging himself with a bed sheet on February 1, 2022, and dying on February 5, 2022.

## IV.   CAUSES OF ACTION

### COUNT I - 42 U.S.C. 1983
### DUE PROCESS CLAUSE--DELIBERATE INDIFFERENCE TO
### KNOWN RISK OF SUICIDE
### PLAINTIFF v. MEDICAL CARE PROVIDERS MASTNJAK, HEHNLY, NOGUERAS
### AND/OR JOHN/JANE DOES #'S 1-10 AND/OR DR. CATTELL AND/OR DR.'S
### JOHN/JANE DOE #'S 1-5

76.    All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

77.    As alleged, Defendants Medical Providers Mastnjak and/or Hehnly and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 knew that the Decedent was withdrawing from heroin/opiates and had a particular vulnerability to suicide and were deliberately indifferent to his substantial risk of suicide by failing to place him on suicide.

78.    By intentionally and/or with deliberate indifference failing to place the Decedent on suicide watch, instead placing him in the general population, Defendants Medical Providers Mastnjak and/or Hehnly and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 provided him the means and opportunity to commit suicide.

79.    Defendants Medical Providers Mastnjak and/or Hehnly and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 failure to place the Decedent on suicide watch was the direct and proximate cause of him committing suicide and constituted a violation of his rights under the Due Process Clause.

80.    The failure to place the Decedent on suicide watch did not serve any legitimate penological interest and/or was not reasonably related to any legitimate penological interest.

81.    The above-described actions of Defendants Medical Providers Mastnjak and/or Hehnly and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 in their individual capacities, were so malicious, intentional and reckless and displayed such a reckless indifference to the Plaintiff's rights and well-being, that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. §1983 and §1988, Plaintiff demands compensatory and punitive damages against the Defendants Medical Providers Mastnjak and/or Hehnly and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5, jointly and/or severally, in an amount sufficient to fully and adequately compensate the Plaintiff and punish and deter the defendants, plus interest, costs, attorney's fees and all other appropriate relief.

<u>**COUNT II - 42 U.S.C. 1983**</u>
<u>**DUE PROCESS CLAUSE—INADEQUATE MEDICAL CARE**</u>
<u>**PLAINTIFF v. MEDICAL CARE PROVIDERS**</u>
<u>**HEHNLY AND/OR NOGUERAS AND/OR JOHN/JANE DOE #'S 1-10 AND/OR DR.**</u>
<u>**CATTELL AND/OR DR.'S JOHN/JANE DOE #'S 1-5**</u>

82.     All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

83.     Defendants Medical Care providers Hehnly and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 knew that the Decedent's withdrawal symptoms were worsening and that he was suffering seizures and withdrawing from heroin/opiates as well as benzodiazepine and ignored the Decedent's worsening medical condition and failed to provide him any medical treatment for his seizures or worsening withdrawal symptoms causing the Decedent to suffer in pain and discomfort.

84.     The Decedents worsening withdrawal symptoms and seizures constituted a serious medical need and Defendants Medical Care providers Hehnly and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 were deliberately indifferent to his serious medical needs by ignoring them and failing to provide any medical treatment.

85.     Defendants Medical Care providers Hehnly and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 failure to provide the Decedent any

medical treatment for his worsening withdrawal symptoms and seizures did not serve any legitimate penological interest and/or was not reasonably related to any legitimate penological interest.

86.     Defendants Medical Care providers Hehnly and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 failure to provide the Decedent any medical treatment for his worsening withdrawal symptoms and seizures was the direct and proximate cause of him suffering extreme pain and discomfort and was a cause of his decision to commit suicide.

87.     The above-described actions of Defendants Medical Care providers Hehnly and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 in their individual capacities, were so malicious, intentional and reckless and displayed such a reckless indifference to the Plaintiff's rights and well-being, that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. §1983 and §1988, Plaintiff demands compensatory and punitive damages against the Defendants Medical Care providers Hehnly and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 jointly and/or severally, in an amount sufficient to fully and adequately compensate the Plaintiff and punish and deter the defendants, plus interest, costs, attorney's fees and all other appropriate relief.

**COUNT III - 42 U.S.C. 1983**
**DUE PROCESS CLAUSE—SUPERVISORY LIABILITY**
**PLAINTIFF v. MEDICAL PROVIDER HEHNLY AND/OR DR. CATTELL AND/OR**
**DR.'S JOHN/JANE DOE #'S 1-5**

88.     All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

89.     Defendants Medical Provider Hehnly and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 were direct supervisors of Defendants Medical Care Providers Mastnjak and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 and directly participated in the decision not to place the Decedent on suicide watch despite knowing that he was withdrawing from heroin/opiates and had a particular vulnerability to suicide.

90.     Defendants Medical Provider Hehnly and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 were direct supervisors of Defendants Medical Care Providers Mastnjak and/or Nogueras and/or John/Jane Doe #'s 1-10 and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 and acquiesced in/condoned the Intake Suicide Screening and decision not place the Decedent on suicide watch despite knowing that he was withdrawing from heroin/opiates and had a particular vulnerability to suicide.

91.     Defendants Medical Provider Hehnly and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 knew of and acquiesced in/condoned the policy of LCP and/or PMC of intentionally answering certain questions on the Intake Suicide Screening "No" so the pretrial detainee/inmate would not be placed on suicide watch and of not placing pretrial detainees/inmates who were withdrawing from heroin/opiates on suicide watch to save money and human resources and enforced that policy in their roles as supervisors thereby participating in the unconstitutional conduct/policy.

92.     Defendants Medical Provider Hehnly and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 acquiescence in and/or participation in the unconstitutional practice, policy and/or custom of not placing pretrial detainees/inmates who are withdrawing from heroin/opiates on

suicide watch was the direct and proximate cause of the Decedents death by suicide and the violation of his rights under the Due Process Clause.

93.     Defendants Medical Provider Hehnly and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5 conduct displayed a reckless or callous indifference to the constitutionally protected rights of inmates and warrants the imposition of punitive damages.

**WHEREFORE**, pursuant to 42 U.S.C. §1983 and §1988, Plaintiff demands compensatory and punitive damages against the Defendants Medical Provider Hehnly and/or Dr. Cattell and/or Dr.'s John/Jane Doe #'s 1-5, jointly and/or severally, in an amount sufficient to fully and adequately compensate the Plaintiff and punish and deter the defendants, plus interest, costs, attorney's fees and all other appropriate relief.

### COUNT IV - 42 U.S.C.  §1983 AND §1988
### *MONELL* CLAIM
### PLAINTIFF v. LANCASTER COUNTY, PMC AND
### WARDEN PAUL SMEAL

94.     All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

95.     The Plaintiff believes and therefore avers that the Defendants Lancaster County and/or PMC and/or Warden Smeal have adopted and maintained for many years a recognized and accepted policy, custom, practice of intentionally failing to place pretrial detainees/inmates with a particular vulnerability to suicide on suicide watch.

96.     The Plaintiff believes and therefore avers that this unconstitutional policy, custom, practice of not placing pretrial detainees/inmates with a particular vulnerability to suicide on suicide watch was implemented by and/or acquiesced in by Defendants Lancaster County and/or PMC and/or Warden Smeal to save money and human resources, and includes having their

employees intentionally answer certain questions on the Prison Intake and Medical Intake/Intake Suicide Screening of pretrial detainees/inmates who are addicted to and withdrawing from heroin/opiates "No" so that the pretrial detainee/inmate would not have to be placed on suicide watch thereby exposing that pretrial detainee/inmate to the substantial risk of suicide.

97.     The Plaintiff believes and therefore avers that the Defendants Lancaster County and/or PMC and/or Warden Smeal have an unconstitutional policy, custom, practice of not placing pretrial detainees/inmates who are addicted to and withdrawing from heroin/opiates on suicide watch despite their knowledge that such persons have a particular vulnerability to suicide and are required to be placed on suicide watch.

98.     Defendants Lancaster County and/or PMC and/or Warden Smeal have been deliberately indifferent to the substantial risk of suicide of pretrial detainees/inmates who are withdrawing from heroin/opiates by ignoring that risk and not placing the pretrial detainee/inmate who is withdrawing from heroin/opiates on suicide watch.

99.     In furtherance of the unconstitutional policy, custom, practice of not placing pretrial detainees/inmates who are withdrawing from heroin/opiates on suicide watch Defendants Lancaster County and/or PMC and/or Warden Smeal have trained Correctional Officers and/or Medical Providers doing intakes/suicide assessments to answer certain questions "No" so the pretrial detainee/inmate who is withdrawing would not be placed on suicide watch and of training the Correctional Officers and/or Medical Providers, including the Correctional Officers/Medical Providers who are Defendants in the instant Complaint, to ignore the fact that a pretrial detainee/inmate is withdrawing from heroin/opiates despite their knowledge that this poses a substantial risk of suicide.

100.    This unconstitutional policy, custom, practice of not placing pretrial detainees/inmates who are withdrawing from heroin/opiates on suicide watch and of training Correctional Officers and/or Medical Providers doing intakes/suicide assessments to answer certain questions "No" so the pretrial detainee/inmate who is withdrawing would not be placed on suicide watch and of training the Correctional Officers and/or Medical Providers, including the Correctional Officers/Medical Providers who are Defendants in the instant Complaint, to ignore the fact that a pretrial detainee/inmate is withdrawing from heroin/opiates despite their knowledge that this poses a substantial risk of suicide has been going on for a number of years, and was a significant factor in the suicide deaths at LCP of Ronald Snyder and Patrick Kanney.

101.    The need to place pretrial detainees/inmates who are withdrawing from heroin/opiates on suicide watch is so obvious that Defendants Lancaster County and/or PMC and/or Warden Smeal policy, custom, practice of not placing them on suicide watch constitutes deliberate indifference to a substantial risk of suicide.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff demands compensatory damages against Defendants Lancaster County, PMC and/or Warden Smeal, jointly and/or severally, in an amount sufficient to fully and adequately compensate the Plaintiff, plus interest, costs, attorney's fees and all other appropriate relief.

### COUNT V-PENNSYLVANIA LAW
### CORPORATE NEGLIGENCE
### PLAINTIFF v. PRIMECARE MEDICAL, INC.

102.    All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

103.    The direct corporate negligence/carelessness/gross negligence of Defendant PrimeCare Medical, Inc., includes but is not limited to:

a.     Failure to property train its employees, agents, ostensible agents doing the Medical Intake/Intake Suicide Screening of pretrial detainees/inmates at LCP, including but not limited to failing to properly train on the fact that heroin/opiate addiction and withdrawal constitutes a particular vulnerability to suicide and requires that pretrial detainee/inmate be placed on suicide watch;

b.     Failure to properly train its employees, agents, ostensible agents doing the Medical Intake/Intake Suicide Screening that if a new commitment is addicted to heroin/opiates upon Intake and hence in the process of withdrawing any question related to whether the pretrial detainee/inmate is withdrawing should be answered "Yes" and the pretrial detainee/inmate placed on suicide watch;

c.     Failure to properly train its employees, agents, ostensible agents that they have an ongoing duty to assess/evaluate a person withdrawing from heroin/opiates and place them on suicide watch;

d.     Training/instructing its employees, agents, ostensible agents to answer the Intake Suicide Screening question referenced in paragraph 36 "No" so the pretrial detainee/inmate would not have to be placed on suicide watch;

e.     Failure to properly oversee/supervise its employees, agents, ostensible agents that conduct the Medical Intake/Intake Suicide Screening at LCP;

f.     Failure to adopt, formulate, and/or enforce adequate policies, procedures and training requiring that pretrial detainees/inmates who are identified as withdrawing from heroin/opiates be placed on suicide watch;

g.     Failure to select, hire, train competent medical providers to identify pretrial detainees/inmates who have a particular vulnerability to suicide, including those who are addicted to heroin/opiates and going through withdrawals.

104.    Defendant PrimeCare Medical, Inc. had actual and/or constructive knowledge of the above acts and/or omission which caused harm, increased the risk of harm, and were substantial factors in causing the injuries and wrongful death of the Decedent.

105.    The direct corporate negligence, carelessness and/or gross negligence of Defendant PrimeCare Medical, Inc., as described above, caused harm, increased the risk of harm, and were substantial factors in causing the injuries and wrongful death of the Decedent.

**WHEREFORE**, pursuant to Pennsylvania Law, Plaintiff demands compensatory damages against Defendant PrimeCare, Inc. in an amount sufficient to fully and adequately compensate the Plaintiff, plus interest, costs, attorney's fees and other appropriate relief.

**COUNT VI- PENNSYLVANIA LAW**
**NEGLIGENCE**
**PLAINTIFF v. PMC, MEDICAL PROVIDERS MASTNJAK, HEHNLY, NOGUERAS, JOHN/JANE DOE #'S 1-10, DR. CATTELL, and DR.'S JOHN/JANE DOE #'S 1-5**

106.    All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

107.    At all times relevant hereto, Defendants PMC, Medical Providers Mastnjak, Hehnly, Nogueras, John/Jane Doe #'s 1-10, Dr. Cattell, Dr.'s John/Jane Doe #'s 1-5 had a duty to comply with generally accepted medical standard in evaluating and treating the Decedent and protecting him from the risk of suicide.

108.    Defendants PMC, Medical Providers Mastnjak, Hehnly, Nogueras, John/Jane Doe #'s 1-10, Dr. Cattell, Dr.'s John/Jane Doe #'s 1-5 violated that duty of care in the evaluation of the Decedent's risk of suicide and the treatment of withdrawal from heroin/opiates, including, but not limited to the seizures he was suffering.

109.    The aforementioned Defendants' violation of their duty of care to the Decedent was a direct and proximate cause and a substantial factor in bringing about Reardon's injuries and death, as set-forth above, and accordingly Defendants are liable to Plaintiff under Pennsylvania law.

**WHEREFORE**, pursuant to Pennsylvania law, Plaintiff demands compensatory damages, from Defendants PMC, Medical Providers Mastnjak, Hehnly, Nogueras, John/Jane Doe #'s 1-10, Dr. Cattell, Dr.'s John/Jane Doe #'s 1-5, jointly and/or severally, in an amount sufficient to fully

and adequately compensate the Plaintiff, plus interest, costs, attorney's fees and all other appropriate relief.

## COUNT VII - WRONGFUL DEATH ACTION
## PLAINTIFF v. ALL DEFENDANTS

110.     All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

111.     As a direct and proximate result of the aforementioned actions of the Defendants, the Decedent, Paul William Reardon, his family and his estate have suffered severe emotional and pecuniary losses and damages including the following:

(a)     an amount which will cover all funeral, burial and estate administration expenses incurred;

(b)     an amount which will fairly and adequately compensate the family members of the decedent for their loss of such contributions as they would have received between the time of the death of the decedent and today. This includes all monies that the decedent would have spent for or given to his family;

(c)     an amount which will fairly and adequately compensate his family for the loss of such contributions as the decedent would have contributed to the support of his family between today and the end of his normal life expectancy; and

(d)     an amount which will fairly and adequately compensate his family for the pecuniary and emotional value of the services, society and comfort that he would have given to his family had he lived including such elements as provision of physical comfort and services and provision of society and comfort.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983 and Pennsylvania Negligence Law, Plaintiff, the Estate of Paul William Reardon, demands compensatory and punitive damages against all defendants, jointly and/or severally, in an amount sufficient to fully and adequately compensate the Plaintiff, plus interest, costs, attorney's fees and all other appropriate relief.

## COUNT V-PENNSYLVANIA SURVIVAL ACT
## PLAINTIFF v. ALL DEFENDANTS

112.     All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.


113.     As a direct and proximate result of the aforementioned actions of the Defendants, the Decedent, Paul William Reardon, his family and his estate are entitled to damages which shall include the following:

(a)     an award of the total net amount that the decedent would have earned between the date of his death and today;

(b)     an award of the net amount that the decedent would have earned between today and the natural end of the decedent's life expectancy; and

(c)     an award of such an amount as will fairly and adequately compensate the estate for the mental and physical pain and suffering that the decedent endured from the moment of the improper treatment by the defendants to the moment of his death as a foreseeable result of the improper treatment.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983 and Pennsylvania Law, the plaintiff, the Estate of Paul William Reardon, demands compensatory and punitive damages against defendants, jointly and/or severally, in an amount sufficient to fully and adequately compensate the Plaintiff, plus interest, costs, attorney's fees and all other appropriate relief.

ABRAMSON & DENENBERG, P.C.


BY: _s/Alan Denenberg_____
    ALAN E. DENENBERG, ESQ.